Good morning and may it please the court. Good morning. My name is Eric Bruce and I represented Mr. Kipp at trial and I also represent him on appeal to this court. At trial, this was a weak and largely circumstantial case in which the government's primary evidence, which was emails written by Mr. Kipp, proved that he was trying to meet Swisher's final and drastically reduced quarterly forecast, but there was no direct documentary evidence that Mr. Kipp ever intentionally booked an improper accounting entry. In its written verdict, the district court mistakenly conflated motive with intent and then compounded that error by making a factual finding that Mr. Kipp had the requisite intent to defraud because he was eligible for an award of stock even though that award was in no way dependent on meeting EBITDA targets and a possible cash bonus even though Swisher was still $11.6 million short of an $11.9 million EBITDA target even after these allegedly fraudulent entries were booked. The district court was also required to make factual findings to support its verdict that Mr. Kipp specifically intended to book improper accounting entries based on the facts known to him at the time, but the district court instead further erred by making clearly erroneous findings concerning each of the accounting entries at issue that fall roughly into the following three categories. First, the district court convicted Mr. Kipp based on facts which amounted to nothing more than an innocent mistake by someone other than Mr. Kipp. Second, the district court relied on facts to convict Mr. Kipp which he never even knew. And third, the district court cherry-picked certain facts that are clearly erroneous based on a fair review of the entire record. The first category of facts which amounted to nothing more than an innocent mistake by someone other than Mr. Kipp show that the district court got it wrong in this case and made unjust findings that must be corrected on appeal. For example, as to the Q2 bad debt adjustment, Mr. Kipp got indicted for what was an innocent mistake and not even his own innocent mistake. Mr. Kipp was indicted and then convicted based on what both government witnesses, Sarah Eichstadt and Hugh Crawford, agreed was an innocent mistake. These were government witnesses who testified that this was an innocent mistake in Swisher's bad debt model. And this entry was disclosed to Swisher's auditor, BDO. And put simply, there was no contrary proof whatsoever in the record that this entry was a fraudulent act by Mr. Kipp. Similarly, with regards to the Q3 Enviro earn-out entry, Mr. Kipp was again erroneously found to have engaged in fraud because Joanne Villard mistakenly used a prior version of a spreadsheet in which she had zeroed out the final two earn-out payments because she believed that Enviro would hit the full $1 million earn-out in 10 quarters instead of the full 12 quarters over the three-year period. And that's all that happened with that entry. Ms. Villard mistakenly used an earlier version of a spreadsheet. But fundamentally, Mr. Kipp and Ms. Villard were doing the right thing here. When Enviro's chances of earning that earn-out diminished due to business interference by one of Swisher's competitors, Mr. Kipp and Ms. Villard appropriately revalued the earn-out and reduced it down to the $500,000 amount that Swisher's COO, Tom Byrne, had told them was the maximum amount that Enviro would earn. Doing anything other than revaluing the earn-out at that point would have violated GAAP and been improper. But nevertheless, the district court found that this was a fraudulent act by Mr. Kipp. But had the defendants not revalued the earn-out at that point, when the operational people at Swisher were telling them that Enviro was only going to earn $500,000, surely they would have been accused of using it as an inflated reserve and been prosecuted on that theory. And that was one of the catch-22s that the government set up in this case when they argued that even booking a GAAP-compliant accounting entry can constitute a crime because if they book the GAAP-compliant entry, they can be guilty of a crime. But had they not booked the same entry, they would have violated GAAP and it would have resulted in improper financial statements, which also could be considered a crime. Now, the second category of factual findings relied upon to convict Mr. Kipp were based on facts which he never even knew about. This included the Q2 Nick Cassione entry, the Q2 Lee County unfavorable contract entry, and the Q4 Shamrock entry. As to the Cassione entry, the district court principally relied on the testimony of two witnesses to convict Mr. Kipp in its written findings, Nick Cassione, who admitted he never even spoke to Mr. Kipp and couldn't even pick him out in the courtroom at trial, and John Perard, the government's cooperating witness, who essentially had recanted his guilty plea by testifying repeatedly that he never intended to commit a crime and never thought he was committing a crime while at Swisher, and who admitted, as to the Cassione entry, that he didn't work on it and couldn't identify a single thing that was improper about it. Similarly, as to the Lee County entry, in order to convict Mr. Kipp, the district court relied on Chris Cothran's testimony, even though, again, it was undisputed that Cothran had never even spoken to Mr. Kipp. And the district court selectively misquoted CEO Steve Perard's testimony to conclude that Mr. Perard testified that the Lee County contract was not an unfavorable contract, even though the entire purpose of Mr. Perard's testimony was that he believed the Lee County contract was, in fact, an unfavorable contract. He had directed Mr. Kipp to book it as an unfavorable contract, and he had previously written a July 19, 2011 memo to Mr. Kipp in which he set out the facts that supported treating it as an unfavorable contract. And was it your position, with respect to that particular aspect of his testimony, that he misspoke, counsel? That's correct, Your Honor, or that he was misheard by the court reporter. All right. I wanted to make sure that I was thinking about the same testimony that you're— I think you are, Your Honor. We set it out in our reply brief. What Mr. Perard said is first he says it was unfavorable as to this contract, period, and then he says words to the effect this was not an unfavorable contract. And I believe what he intended to say was this was not an unprofitable contract, and either he had a slip of the tongue or the court reporter misheard him, because the rest of the testimony, both preceding that and following that, made clear that Perard's position was that this was very much so an unfavorable contract. When court reporters mishear, there's a way to correct transcript. That's correct, Your Honor. And I looked at that rule, and I didn't think we met the rule where you need to go back and correct the transcript. It wasn't an issue, obviously, until the district court's opinion came out that, you know, it highlighted that that was what the district court was hanging its hat on. And at that time, after the district court issued its decision, I didn't think I was in a position to try to go back and correct the record at that point. The record is what the record is. At that point, correct. It is now. I mean, the record is what the record is. Certainly. And I think you're left with a record. We can't fix it for you. I understand. I'm not asking you to. What I am asking you to do is consider that in the sentence right before the sentence that's quoted by the district court, Perard does say it was unfavorable as to this contract. So he is saying it's an unfavorable contract. And then he contradicts it by saying it was not an unfavorable contract. But that was not to explain why what he means is it's not an unprofitable contract. And all of the witnesses agreed that a contract can still be profitable but unfavorable. On this point, Your Honors, what was important is that the district court continually cited evidence from witnesses that Mr. Kipp never knew and never spoke to. And that was indisputed. And what the court should have done is look at what Mr. Kipp knew at the time. And on that point, what Mr. Kipp knew about both of these entries, Cassione and Lee County, was set out in a memo that Mr. Perard had sent to Mr. Kipp. It's Kipp Exhibit 1012, setting out all of the facts that Perard was relating to Kipp in order to book this Lee County contract as an unfavorable contract and book the Cassione entry. And based on those facts, both defense accounting experts testified that the entry was proper and gap-compliant and needed to be booked the way Mr. Kipp booked it. So our position, Your Honors, is that Mr. Kipp can only be judged based on the facts he knew at the time, not facts that were related by witnesses he never spoke to. The Shamrock entry was another example of this happening, in which the district court relied on the testimony of Dan Carroll from Shamrock and Denise Kennison from Proclaim, but both, again, admitted that they had never spoken to Mr. Kipp. And the district court, again, ignored the facts that Mr. Kipp actually knew, which is what he learned from COO Tom Byrne, who told him that Swisher should be recording a receivable because the money was not due to Shamrock, and he had instructed Mr. LeBron to get the money back. The district court also ignored evidence of Mr. Kipp's own innocent state of mind. I'd ask the court to look at Kipp Exhibit 1091, in which Mr. Kipp double-checked his own view of the accounting entry with Ms. Viard after Hugh Crawford raised concerns about it, which shows that Mr. Kipp was 100% convinced he had the accounting right and wanted to double-check himself after Crawford raised concerns. Now, in the third category, the district court unjustly cherry-picked certain facts to make clearly erroneous factual findings that are not supported based on a review of the entire record. Now, this trial lasted, what, three weeks? Approximately, yes, Your Honor. And Judge Cogburn heard all the evidence. He did. And he wrote a, what, 50-page verdict. That's correct, Your Honor. And it was a trial to the court. Excuse me? A trial to the court. That's correct, Your Honor. Everybody away from the juries. That's correct, Your Honor. He did write a lengthy opinion, but Judge Cogburn also said during the middle of the trial that he didn't understand the accounting. He was very candid about that. And our view is that to get a just result in this case, you had to engage on the accounting. But he had experts. That's correct. Both sides had experts. No, only the defense had experts. Only the defense had experts. The government didn't call experts. Okay. But in his, notwithstanding the fact that he said he didn't understand the accounting, he also didn't rely on the experts, the defense experts. He cited certain portions of their testimony, but not on the core issues of whether these entries were GAP compliant or not. And I think he should have relied on those defense experts because he admitted he didn't understand the accounting. And what the defense experts did, in contrary to how the government tried its case, is the defense experts looked at the evidence that was presented to Mr. Kipp, what he knew at the time, and opined based on those facts, was this a GAP compliant accounting entry? And in each case. Thank you. Thank you, Your Honor. All right. Mr. Volkoff. May it please the Court. Michael Volkoff for Joanne VR. Judge King, you raised an interesting issue. This was a 51-page written decision. This was a three-week trial, a bench trial. And what actually comes across when you look at this record, I did not do the trial. I'm here on appeal for Ms. Viard, is there are really significant errors in the factual findings in this case, especially as to Ms. Viard. She was involved and basically she was convicted of conspiracy to commit securities fraud, lie to switchers, auditors, and false accounting entries. But you know what? The district court here mistakenly cited or characterized record evidence and it ignored substantial evidence. Here what we're taking is actions by an internal CPA who communicated openly about the determination of complex accounting issues. She conferred with others in the company, its auditor, BDO, and an outside consultant. She disclosed two of the three accounting entries to the disclosure committee and to the audit committee. And she flagged those issues for close determinations in the draft SEC filings she prepared. Her actions were hardly those of a fraudster. She wasn't hiding anything. She didn't seek to disguise or deceive. Her actions were consistent with a professional seeking in good faith to resolve complex financial issues. One of the things that the government relies on with respect to your client I think is the Cassion buyout. Right. And they indicate that she failed to disclose some information to BDO and to the committees with respect to whether or not there was a contract. And that's a perfect example of how the judge got it wrong. Perfect example. Because what happened was there's no request that was ever made by BDO, the auditor, for a copy of the severance agreement, quote unquote severance agreement. In fact, the documents show, and if the court would look at 5077 and 5078 of the record, and 50, 5563 and 5564, the information that was provided to her for the entry referred to the agreement as a structured severance or a severance. It turns out that there was no severance agreement. It was an employment agreement. She provided this information, the same information that she had, she provided to the auditors. She disclosed all this information. BDO never asked for a copy of the quote unquote severance agreement. It turns out there wasn't one. Why did you elect a bench trial in this case? How did we elect it? Why? Well, we thought that the issues were pretty complex as to the accounting issues. And I think that our client felt that, and with Mr. Kipp, that the court would be in a better position to understand the complex issues than a jury. The problem that we have here is the court made serious errors in the factual findings. Because what happened in this case with regard to the severance issue, on the day right prior to the audit committee meeting, there's an e-mail where Ms. Biard says, can you dig up the actual severance agreement to her client company or where she worked? Our auditors are struggling with this event, and the best proof we could provide them is evidence that the severance agreement was in place. After the audit committee meeting, after is when she learned she got the employment agreement at that point. But she already had documents which accurately summarized what was in the employment agreement. So there was no misleading information here. The judge erred when the court failed to explain what was the information that was withheld and how would it have affected the entry. No finding. No finding. No explanation from the court. This is much ado about nothing. You wanted a 250 page opinion? I'm afraid of those findings. Look, I understand it's 51 pages. But I always say it's the quality of the words, not the length of opinion, that necessarily matters. And in this case, we're talking about three entries. Taking someone who does hundreds of entries a quarter, and now the government comes back and says, these three entries were a mistake. You're going to jail. We're not going to convert the accounting profession into something like that, hopefully. So with regard to, and we've talked about the Cassione agreement. The Lee County, here's another example. The Lee County matter was based upon testimony that the court said Cothran provided. And that Cothran told her that this was not an underwater contract. Please read the record. Page 45 of our brief. What Cothran testified to. I don't believe I'm agreeing one way or the other in the email. I'm trying to explain that because the contract was recently bid, it may be difficult for it to be underwater. Then later, Cothran, they have a phone call. Cothran is asked to get another phone call. All right. I believe you can't recall the specifics of this call. Answer, no. I mean it was about the contents of the email and walking through some specifics. But I don't remember exactly what we discussed. The court, okay. The court then says that Mr. Cothran, quote, advised Joanne Viard that the contract was not unfavorable. The citations do not support the statement. That's an error. And it's a big one. It's plainly wrong. That's the second. The third was the enviro burnout. And that burnout adjustment was justified. It totally makes sense. The reserve was set at a million dollars, assuming that they were going to have to pay the executives of enviro based upon quarterly revenue targets for 12 quarters. So they booked a million dollar reserve. What happened? Well, after that, enviro, because of a competitor's actions and whatnot, ended up not even coming close to the revenue targets. You all came in afterwards and did you ask the judge to vacate his decision and verdict and all that? It was treated just like a trial. He even called his 51-page decision a memorandum of decision and verdict. Correct. And so we sort of take that the same way we take a jury verdict. We look at it and would like most favorable to the prosecution. Absolutely. And you've got – Look, we recognize this is a high hurdle. We get it. But we're talking about a woman who got 14 months in jail for three mistaken accounting entries. And she was a subordinate, wasn't she? What? Subordinate? Yes, she was a subordinate. She wasn't a high-level executive. She wasn't sitting in on senior planning meetings. Mr. Gimp was her boss. Right. And he got more time. He got more time. Actually, it's not 14. She got 20 months. And she's sitting in jail right now for three accounting entries, which makes no sense given the fact they're all three plainly supported and the court made factual errors. But they falsified these reports. They falsified the books in these reports. There's not a knowing. That's what the judge has found here. That's what that verdict is. That's the way I read it. Right. I mean, I read black and white. This is just like the Goyle case in the Ninth Circuit. And there's not any evidence of a knowing falsity. Where's the evidence? Where's the evidence? Judge Cogburn says there is. Well, and just like an emperor with no clothes, I can tell you the emperor's got clothes, too. But not in this case, Your Honor. Not in this case. Well, he says the entries are made for a fraudulent purpose and fraudulent in and of themselves. And that's what the judge says. That's what this verdict said. And they're taking facts that would normally be resolved in a civil case and turning it into a criminal case. This was not fraud. There's no evidence that she was aware it was fraudulent. None. And the fact is, the judge can say whatever he wants, but the fact is that the factual underpinnings of this are plainly wrong. There's no evidence of a fraudulent act. The judge is the judge, and he's an experienced judge. I mean, he's been around the horn, and he was a prosecutor, and he was a defense lawyer, and he was a magistrate judge. I was a prosecutor for 25 years, Your Honor. I know judges. I've been before fantastic judges, and he appears to be a great judge. But judges sometimes make mistakes. Did he make a finding as to one of the charges that your client didn't have the intent to defraud? Exactly. So she was acquitted as to various counts that she didn't have an intent to defraud, meaning to personally benefit from this. But it's a far cry to say that three accounting entries that may have been a mistake indicates fraudulent intent. That's not the burden here. I get it the judge sat there. I get it the judge saw the witnesses. But I'll tell you this. When you write an opinion, and I was taught very early on, when you cite something, it better say that. Well, here it doesn't. Where the court cited the evidence, it doesn't. The evidence indicated that the e-mail exchanges were part of an overall conspiracy to cook the books and make them reach, make the figures, tailor the figures to reach a preconceived result. What about all of these statements that are made, this is a bad guy and would put us back below so and so? I need about so many additional thousands in income to get to this. And then they say, let's work up the number. We'll show up. We'll get it in bad. We'll get it in bad debt. And then I need to get about $300,000 in expense reductions. In other words, this is particular. I realize you're representing the other person, but in the case of Kip, there are all these e-mails. And they all relate to cooking the figures. And your client was pretty closely tied in with Mr. Kip. She's an accountant in her own right. And it's hard for me to believe that she was just left out of what seems a fairly blatant attempt on the part of Mr. Kip to come up with the kind of figures that would justify salary raises and bonuses. Salary raises and bonuses for him, you mean, or for people? For both. She wasn't entitled to anything based upon the revenue targets. She's just the external reporting person who drafts the 10-K and 10-Q. Well, it's hard for me to believe there wasn't something in it. We'll hear from the government on that point. Excuse me, Your Honor. She was acquitted because the judge found she had no intent to defraud. There was no personal benefit to her from this scheme. Yeah, I understand that. But that sort of undercuts your point that the judge didn't really know what was going on? Well, no, the judge understood that part. I'm saying when you make factual findings. That makes it sound like he's really careful. Well, he may have been careful as to that, but he wasn't careful as to these specific citations, as to these three entries. Well, you've got some rebuttal time. Thank you. You can reserve that. And let us hear from Mr. Miller on this. May it please the Court, my name is William Miller. I'm here on behalf of the United States. Obviously, we are not here to retry this case. Judge King, as you mentioned, the standard and the question for this court is whether, viewing the evidence in the light most favorable to the government, there was substantial evidence to support the district court's verdict. The answer to that question— Well, it's a sufficiency of the evidence case, but I would like to hear about Ms. Veard because she seems to be a less important or a less central person in the various conspiracy accounts than Mr. Kipp. So, I wonder if I could ask you to begin with her. Yes, Your Honor. And she is certainly less culpable than Mr. Kipp, who was the CFO. And the sentence reflected that. And the sentence reflected that. She was the director of external reporting for the company, which, as the district court found, is a gatekeeping role. She was responsible for the SEC filings and the reports that were made of those financial statements. What was in it for her to be a part of it? Normally, when people engage in a conspiracy, there's something in it for them. And I guess Mr. Kipp stood to benefit in terms of salary and bonuses. Is that correct? Yes, Your Honor, that is correct. And that's what the district court found. I had two responses to that. First, she got a promotion during this time period. She got a raise. There were benefits that accrued to her during the course of her employment. I think the evidence showed that, by contrast, Hugh Crawford, who was the employee who blew the whistle and refused to go along with this earnings management scheme, got fired. So, what you're saying is that one way or another, advancement in the company depended on having the figures show a certain amount of profit and having these individuals be able to have the books read in a fashion that was favorable to the company's profits. I think that's right, Your Honor. I will say that the intent required for the second and third objects of the conspiracy, which are the objects that Ms. Biard was convicted of, was knowing and willful participation in misleading auditors and falsifying books and records. So, the personal gain, really, from the court's perspective below, went to the intent to defraud, which was the object that he acquitted her of. I think even on that… But what was the benefit to her? So, I don't know that the government had to prove a benefit to her, I guess, was my point. No, I'm just wanting to know. But I think it was advancement in the company. This was the tone that was set. This is what it took to move up. And she did, in fact, move up. And we think we proved that below, even though the court didn't necessarily… Why don't you all put on any experts? You know, the other side put on experts. And I'm not a great believer in the overuse of expert testimony, because sometimes they can sort of take the common sense out of the case. But in this kind of situation, where it involves fairly complex questions of accounting, why did you put any experts on? Well, a couple of responses. First, we did call Byron Berry, who was the auditor from BDO, who has the technical knowledge and did go through these different entries that were examples of fraud. Is he a CPA? He is a CPA as well. And he was the chief engagement partner who was in charge of the audit. So we did have a witness who testified about these various entries. This court… Who testified about the accounting principles? Yes, Your Honor. Okay. And really, there wasn't much dispute over the actual principles that were in play here. It was about fraud, like all of these types of cases are about. So the trial devolved not around… The trial devolved around issues of SIENTA? I think that was certainly part of what the trial was about. But where I was headed was this court, in the Rand opinion, said that what these fraud cases are about is proving intentional misstatements of financial information. It's not about prevailing in a battle of the experts over a gap. That's a principle that comes from the Second Circuit's case in Evers. And that's what this case is really about. And that's what both of my colleagues here have overlooked is the fraudulent earnings management scheme that was going on at this company. Judge Wilkinson, you touched on it a little bit, Your Honor, in your last questions there. But what the evidence showed in this case was at the end of every quarter, a concerted effort by Mr. Kipp with the assistance of Ms. Viard to manage earnings to achieve a predetermined earnings target. False statements don't actually need to be made to another person or individual. They can just be false entries in ledgers that are eventually going to be relied on by someone else. But we're not talking about something that necessarily has to be made from A to B. That's right, Your Honor. And I think what I was saying there is that that is borne out by the e-mails in this case. And there's three characteristics of those e-mails that I want to highlight. And these are the quarter close e-mails where the defendants are clearly driving toward a target. The first characteristic is that these are just open-ended requests from Mr. Kipp to the accounting department to make up for earnings when operations is coming up with a shortfall. That's not forecasting, which is what the defendants have argued in their briefing. Was it necessary here to charge so many different conspiracy counts? I mean, we've got conspiracy to self-cook the books on earnings. We've got conspiracy to make false statements to the auditors, conspiracy to falsify the books. Why was the case charged in the way that it was charged with so many multiple conspiracy counts? Well, those are all three objects of the same conspiracy count, just to clarify. It was one conspiracy count with three objects. That's right, Your Honor. You talked about that earlier, that he was acquitted on one object and found guilty on the other two. As to Miss Viard. Yes, to her. But all you have to find is an object. And I misspoke on that, Your Honor. He actually found her guilty of all three objects and acquitted her of the substantive offense of securities fraud. All right. But for a conspiracy offense, you need to prove one object. You can allege three or you can allege a dozen, but you only have to prove one. That's my understanding of what the law is. Right, and that's my understanding as well. So why do you have a verdict on each object? You just have a verdict on the conspiracy. It's either guilty or not guilty on the conspiracy. Right. I think that's right. The court did go through each object in its opinion to explain its reasoning against each object. Right, he did. He went through each object and said that here, I mean, and pointed out that you had proven two of the three. One of the three was all you had to prove. Right. And he did find that we actually proved all three of them. He just relied on some agency principles as to one of those objects. Mr. Miller, I want to hear the argument as you outlined it, as you go forward. I simply would ask that you take this question into consideration as you go forward. I want to know, as it relates to these two defendants and as it relates to the seven entries that are at issue, what takes this from the business model of trying to meet a target into criminal conduct? So if you would address that as you're going forward, that will be helpful to me. Yeah, sure. And that's exactly where I was headed with those three characteristics of the closing emails. And so the first one was these open-ended requests for earnings to reach the predetermined targets. All of the witnesses, including the defense's witnesses, said managing to a predetermined target like that through one-sided accounting is fraud, and that's what makes this a crime. And I'll call the court's attention to it. Isn't that what we used to call cooking the books? It's cooking the books. Some of it's cookie jar accounting. I mean, all of that was present in this case. But with respect to those open-ended requests, it was prevalent in every quarter. In Q2, I need about $250,000 in income to get to $3 million. That's an open-ended request. That's not tied to any kind of variance analysis or forecasting. That's going to the accounting staff, whose job it is to be the scorekeepers, to try to help them run up the score to get to a predetermined number. In Q3, there's an open-ended request from the defendant kit to Ms. Viard. I need to get about $300,000 in expense reductions. Ms. Viard writes back, here are a few ideas of how to get there. And so these are the types of open-ended requests that are not emblematic of forecasting, which is perfectly appropriate. They're emblematic of cooking the books or fraudulent earnings management. In the fourth quarter, I would suggest it got even worse. And in the emails there, we are still short of the target. We will get to $5.4 million. What are the options to find the remaining $131,000? Again, an open-ended request of the accounting department to try to make up a shortfall in operations. The other component of those emails that I think Judge Berger distinguishes this from run-of-the-mill business operations is the offsets for the negative entries. And so there you saw emails where the defendant would write things like, if that's what you think, you need to find another $90,000 to offset it. Well, just because you find an unfavorable entry, it's not proper accounting to just go try to find something else that you might be able to justify to offset that unfavorable entry. That's another distinction. Who do you think the chief victims are in this sort of fraud? The victims here in this particular fraud were twofold. One would be the investing public. They're being deprived of their right to reliable financial information. Was this information, this accounting information, put out on the street or been involved in annual reports or prospectuses? I mean, what use was made of the information? These numbers that are laid out in those quarter close emails, $3 million for the second quarter, $5.2 million for the third quarter, and $5.4 million for the… Well, what use was made of it? They were directly reported in the 10-Qs and 10-Ks to the investing public. And in fact… These are public corporations. This is a public company, and this earnings number was reported in the final report to the public. And so this was a number that was broadcast to everyone. So the investing public is a victim of it. And then you said you were telling me there were two victims. Well, the second victim here would be the bank. This was also charged as bank fraud. And in this case, the bank had certain expectations about what the earnings number would be. Those were tied to the financing for the company and also to additional financing for a deal that they were trying to accomplish. But to go back to the first one and the announcements in the 10-Qs and the 10-Ks to the street, even Swisher says we're reporting this number because we think it's important to the company and to investors. How was the bank defrauded? Was the bank led to lend additional funds to the company on the basis of these more glowing earnings reports? The bank was examining the earnings in connection with a potential deal, and they were going to extend funding to that deal. Was it in connection with a potential loan or it wanted a financial statement as part of the loan application? Correct. So in connection with this particular deal, the defendant KIPP was directly corresponding with the bank. Here's where our number's coming in. There were memos written about that. And those were the numbers that the defendants were managing earnings to. In addition to that, there was also an existing loan or credit facility that Swisher had with Wells Fargo that required regular reporting of these earnings numbers. But especially in quarters three and four, these numbers that you see in the quarter close, the 5.2 and the 5.4, those were the numbers that were communicated directly to the bank in connection with this G&K deal. And you can see from the e-mails, Mr. KIPP is even saying, we need to come up with this income or we're going to miss the bank forecast. There were also two witnesses, John Perard and Hugh Crawford, who testified that Mr. KIPP told them, if we hit our number, the financing's going to come through and the deal will happen. If we miss it, the deal's dead. And so there was ample evidence to show that these numbers were important to the bank and that that was one of the reasons for the earnings management scheme. To return to your question, Judge Berger, the third thing I did want to mention about those quarter close e-mails are the references to what's commonly referred to as cookie jar accounting or moving money from reserves from one quarter to another. There's several e-mails where Mr. KIPP says, if we hit the number, I'll send some money back your way. That's an example of manipulating the reserves so that you have extra reserves to pull down later on to benefit income. And those are e-mails that all of the accountants who testified would look at and say, yeah, that's not appropriate. I don't think those are defensible in any way. And there's several examples of them. And there's another one, we'll use the things we find to refill the cookie jar. Let's put some cushion in the event BDO finds a bad guy. So these are all examples of e-mails in an earnings management scheme that distinguishes this from forecasting or sort of what you would expect in a general business. And they're all things that the defendants have glossed over to this point today. Let's talk about materiality a little bit here. And I think that you have covered that as it relates to the bank, quite frankly. When we talk about the investing public, there was some dispute between the parties as to whether the entries that are the subject of the case would, in fact, be material to a reasonable investor. Based on the fact that as an acquisition company, there's some argument that investors would be looking long-term as opposed to short-term. And so for these entries, I would like to hear you address the issue of materiality, which we also will have to discuss. Yes, Your Honor. And so the question with materiality is always, is it quantitatively material and is it qualitatively material? And I think that the point Your Honor was making relates perhaps more to the quantitative side with respect to a company like this that is a growth company. But the question for the court and the question on appeal is whether there's substantial evidence to support the district court's verdict. And on that point, what he found was that just these entries that we offered as examples and that he found were examples of this earnings management scheme in operation accounted for between 15% and 20% of that reported adjusted EBITDA number that I was discussing with Judge Wilkinson earlier. And so that is quantitatively material to that number that was reported to the street based on the way the courts look at these things. That evidence was supplemented with the testimony from Andrew Whitman, who was a stock analyst, who said adjusted EBITDA was the primary metric that he evaluated when he was doing his analysis. It was also bolstered by the fact that Swisher itself says, we're reporting adjusted EBITDA because we believe investors and analysts and other interested parties would care about this number or are interested in this number to evaluate our results. And so while there may be an argument that, hey, this is a growth company and does it really matter? The court, of course, did not have to accept that argument and our task on appeal is not to disprove any innocent explanation. The question is just, is there substantial evidence to support the court's finding? And I think as to that adjusted EBITDA number, there was ample evidence to support his finding on the quantitative materiality point. On qualitative materiality? Do we hear on the standard of review one of clear error or the standard of review one of substantial evidence? Or what do you think? Or is it both? I think it could be both if there were a clear error. But the ultimate question is whether or not there's substantial evidence to support the district court's verdict, viewing the evidence in the light most favorable. And you say, and then with particular findings of fact, the standard is clear error. I believe that's correct, John. I mean, what distinguishes... I've always been just interested in these cases as to what the connection is between the substantial evidence standard of review and the clear error standard of review. And they sort of get talked about interchangeably. And I think what you said to me is the way I've tried to separate them out is that the substantial evidence just goes to the overall question of whether there's substantial evidence to support a particular conviction and that the clear error would go much more to a particular finding of fact. We're talking about a bench trial as opposed to a jury trial. And either way, whether it's a substantial evidence standard or a clear error standard, the burden is very high. It's a tall mountain to climb. And I think that's where we are here. This was a three-week trial, and the district court had a chance to engage with the evidence and consider it in an amount of detail that we do not. The district court heard live testimony, and we have not. And so it goes to the question of who has the best eyes and ears to resolve this. I think in questions of depth, you have to give some credit to the fact that the trial judge had a grasp of the case after sitting through it for three weeks. I would agree with that, Your Honor. And just to build on the point I was making to Your Honor, Judge Berger, those e-mails were also supplemented by live witness testimony that the district court heard from. Our very first witness was Hugh Crawford, who was the controller of this company, which is a very senior accounting position. He was fired for refusing to go along with that earnings management scheme. And he reported his concerns to the auditor and to the audit committee, and they commissioned an investigation that ultimately resulted in the termination. Well, the e-mails would be condemnatory when you pile them up against the – pile them up on – I mean, it's about as sort of open an expression of scienter as you're likely to get. At least on the part of Mr. Kipp. And, Your Honor, I think the e-mails also show Ms. Viard's active participation in that. I cited one of them a moment ago. Of course, Mr. Kipp, he's the CFO. He's the architect of this fraud. But he does have these open-ended requests. Where are we going to come up with earnings? And Ms. Viard chimes back in. Some of those requests are made to Ms. Viard. Yes, Your Honor. And she's an accountant in her own right. She has an accounting background. Right, and I think another compelling piece of evidence as to her that came out in trial is the auditor and one of the lawyers who conducted the internal investigation testified to statements that she had made previously during the investigation that would be admissible, at least as to her, in which she acknowledged that this was not appropriate and not the way things should have been done. At this point, I'm going to ask my colleagues, if they have further questions of you. Judge King, do you have some further questions of Mr. Mill? I'm good, Judge. What? No, I do not. Thank you, Judge. Thank you, Ms. Mill. Let's hear a rebuttal initially from Mr. Bruce. Thank you, Your Honor. I did want to pick up briefly on the question of materiality and make two points. First, we contend the district court made a purely legal error by concluding that the accounting entries at issue were material because, as the court put it, adjusted EBITDA was the metric relied on by Swisher and by stock analysts. This was not the proper legal test. As this court has said in SEC v. Pirate Investor, the focus should be on a reasonable investor. What's important to the company or some stock analyst isn't what matters. There should be evidence on what would be material and important to a reasonable investor in making an investing decision or altering the total mix of information that was available. That's an issue that I think this court. A reasonable investor wants it to be accurate. Well, certainly, Your Honor, investors rely on financial statements, but there's a question of materiality even in that statement. They don't want the books to be cooked. Certainly, Your Honor. To use the vernacular. But you have to look at the individual accounting entries and the statements that are made. So if, for example, a CFO booked an improper $10 accounting entry, I don't think many reasonable investors would think that was material. So there should be some evidence in the record of what's important to an investor. And here there was none because the government chose not to call any investors, as the government in prior cases has done. In SEC v. Pirate Investor, the SEC called actual investors to say, yes, this misstatement would have been important to me in making an investing decision. That's a civil case? Correct. By the SEC, civil enforcement. Was that a trial of a jury? I believe it was, Your Honor. And here we had a trial of the court, a criminal case. Correct. But I think you still need proof. Judges understand things better than jurors do as a general proposition and these kinds of things. Well, but there still needs to be proof in the record, Your Honor. Sure there does. As to what's important. And we got an able, experienced district judge. What I'm saying is the way the government tried the case is by calling a stock analyst instead of an actual investor, there was an insufficient amount of proof in the record as to what would have been material to a reasonable investor. But a stock analyst. I'm not talking about a reasonable investor. The people who follow these kind of financial statements and the rest have a role. They're by and large a fairly sophisticated lot. I mean, people are working through investing through brokers and banks and people who have a degree of sophistication about a company's financial assets and its financial status. And we're not talking about folks that are just sitting in their living rooms thinking, oh, this would be a good one. I mean, all of these investments are filtered through groups of people with a background in finance and training and reading financial statements. I see my time is almost up. May I briefly respond, Your Honor? Yes, could you do it briefly? Yes, certainly. We did call an expert witness at trial regarding materiality. And what her event study showed was that these earnings misses were not material to investors because the stock never moved, the analysts never downgraded the stock. And, of course, you still have the question of the banks. Of course, Your Honor. But on that point, if I may briefly, what the banker, Kevin Harris, testified was that small accounting entries like $100,000 entries were rounding errors that would not have materially impacted the bank. Okay, thank you. Thank you, Your Honor. Mr. Volkoff, let's hear from you in rebuttal, sir. Well, I recognize we have a mountain to climb, and I wanted to make just a couple of points. One, with regard to Ms. Viard, she was not charged with bank fraud. She had nothing to do with the banks. She didn't deal with the banks. She knew nothing about the loan whatsoever. Secondly… She does have an accounting background, and she does seem to be someone in whom Mr. Kemp confided. And, I mean, the relationship between them seems to me to be one of fairly easy communication and that he was willing to confide in her as to what he wanted to do. Now, I'm not sure all those emails would have been directed, those incriminatory emails would have been directed to her, but I don't know to whom else they would have been intended. Well, she was definitely in communications with him, but what she did with the information or with the task that she was given was she conferred with BDO, she talked to outside experts, she raised questions as to whether or not this was a proper entry. She said the reason she consulted with Mr. Cochran was to make sure that there was support for this and make sure it was the right decision. This is not a criminal scheme where people were acting, where she was acting in hiding. She was out in the open showing it to BDO, showing it to a consultant, and disclosing it to the audit committee with the language, these are close calls. I mean, that to me says she's not acting with criminal intent, she's acting as a professional should in this situation. But yet, and not only that, I would also point out there was record evidence here of various entries that she made sure were not put in because they weren't proper, where she did apply the GAAP standard. And on page 31 of our opening brief in footnote 14, we cite numerous examples where she said, we better talk to legal, we better do this. So now, post hoc, I'm going to come in and show you three entries where she made mistakes and call it criminal. But he's emailing to her over and over, you know, let's work up the number. If we are short, we will get it in bad debt. She wasn't involved in the bad debt. Pardon me? She wasn't involved in the bad debt transaction at all. She knew nothing. She wasn't involved in that. She was involved in three entries. But a lot of these emails were to her. Kip says, here's the sum of my handiwork for the day. I think if we can make all these sticks, we'll make it to the forecast of 3.5 million. Let's make sure we're in sync. But he says, here's the sum of my handiwork. I think if we can make all these stick, we will make it to the forecast of 3.5 million. When you get communications like this, why do you need to run it through somebody to decide whether it's unlawful or not? It seems to me that the substance of these emails is kind of fishy on their face. I get the emails are incendiary. The problem is, look at what she did with the information. Look what she did in terms of her conduct. You have to make a specific finding beyond a reasonable doubt that she was engaged in false entries. And everything here shows that she acted contrary to we're going to hide this. If anything, she consulted and brought in more people to what should have been a criminal conspiracy where people are hiding and cooking books, as you guys, as Judge Court says. This is not cooking books. She did everything to show that these were proper entries and documented it. And she goes to jail? That makes no sense. I understand your arguments. It's a question for me as to where they're best made and where they're best decided. For me, it's primarily a question of what the district court is more capable of doing. Did Ms. Veard testify? No, she did not. Normally, in these kinds of cases, a lawyer will advise the client that if you don't testify, you're really running a big risk. Well, whether or not she testified to me, Your Honor, is irrelevant to one. She has a perfect right not to testify. But the court has an obligation and the trial has an obligation to get it right. And this is wrong. And if you look at these citations and look at the evidence, you're going to come to the same decision. All right. I want to thank you. Thank you. Thank you both. Thanks very much to our courtroom deputy for her assistance. And we will adjourn court and come down and greet counsel. This honorable court stands adjourned. Sonny Dye, God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, Robert B. King, Irene C. Berger